# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

KRISTEN E. WYSOCKI,

                               **Plaintiff,**

-vs-                                                 **Case No.  6:06-cv-255-Orl-KRS**

MICHAEL J. ASTRUE, COMMISSIONER
OF SOCIAL SECURITY,

                              **Defendants.**

_____

## ORDER

This cause came on for consideration without oral argument on the Complaint filed by

Kristen E. Wysocki, seeking review of the final decision of the Commissioner of Social Security

denying her claim for social security benefits.  Doc. No. 1.  The Commissioner answered the

Complaint and filed a certified copy of the record before the Social Security Administration

("SSA").  Doc. Nos. 6, 7.  Pursuant to the consent of the parties, this matter has been referred to

me for disposition under 28 U.S.C. § 636(c).  Doc. Nos. 9, 10.

## I.       PROCEDURAL  HISTORY.

In March 1994, Wysocki applied for disability benefits under the Federal Old Age,

Survivors and Disability Insurance Programs ("OASDI"), 42 U.S.C. § 401 *et seq*., and under the

Supplemental Security Income for the Aged, Blind and Disabled Program ("SSI"), 42 U.S.C. §

1381, *et seq*., (sometimes collectively referred to herein as "the Act").  R. 60-64, 65-77.  The

applications alleged that Wysocki became disabled on September 1, 1989.  *Id*.

After the initial filing, Wysocki's case began a tortuous journey through the administrative and legal system.  In April 1996, an ALJ found that Wysocki suffered from a severe affective disorder and reflux disease, but that she could, nevertheless, return to her past relevant work as a clerk or assembler.  R. 21.  Wysocki ultimately sought review of this decision in this Court.

On October 8, 1998, this Court granted the Commissioner's unopposed motion to reverse the decision and remand the case for further proceedings.  Specifically, the Commissioner requested and the Court ordered that the Administrative Law Judge (ALJ) "hold a new hearing, and . . .obtain testimony from a medical expert to assist the ALJ in determining the severity of the Plaintiff's mental impairment during the period at issue, and to address all the opinion evidence of record."  R. 320-21.  Thereafter, the Appeals Council vacated the ALJ's original decision and remanded the case for further proceedings consistent with the Court's order.  R. 323-24.

An ALJ held a new hearing and took testimony from a licensed clinical social worker and psychotherapist as the "medical expert."  On March 20, 2000, he issued a decision again denying Wysocki's applications.  This ALJ found that Wysocki had an affective disorder, an anxiety disorder, a personality disorder, and a history of gastric reflux disease and migraine headaches, which were severe impairments. The ALJ concluded that Wysocki could return to her past relevant work as an assembly worker or a warehouse clerk.  R. 246-54. Wysocki again sought review of this decision in this Court.

Once again, the Commissioner requested that the Court reverse the decision and remand the case for further proceedings so that the ALJ could obtain testimony from a medical expert to assist in determining the severity of Wysocki's mental impairments.  R. 394.  The Court granted

Case 6:06-cv-00255-KRS  Document 20  Filed 09/11/07  Page 3 of 17 PageID 82

the motion. R. 393. Thereafter, the Appeals Council vacated the second ALJ's decision and

ordered the ALJ to "obtain medical expert testimony to assist in determining the severity of the

claimant's mental impairment(s)." R. 390-91.

Once again, the ALJ failed to comply with the Appeals Council's direction and the order of

the Court. In a decision issued on November 28, 2005, the ALJ wrote as follows: "As instructed

by the Appeals Council remand order, a request was made to obtain testimony from a medical

expert, but there were no medical experts available." R. 364. The Commissioner offers no

explanation why a medical expert was not provided; his attorney argues merely that it "is an

unfortunate and frustrating circumstance, but should not merit an award of disability." Doc. No.

19 at 9.

The ALJ noted that because Wysocki had been found to be disabled as of February 1, 2001,

pursuant to a subsequent application for SSI benefits, he was required to consider only whether

Wysocki was disabled during the closed period beginning September 1, 1989, through January 31,

2001. R. 359. The ALJ concluded that Wysocki had a bipolar disorder, a post-traumatic stress

disorder, an obsessive-compulsive disorder, an attention-deficit disorder, a borderline personality

disorder, a history of gastroesophageal reflux disease (GERD), and a history of migraine

headaches, which were severe impairments. R. 371. The ALJ rejected Wysocki's argument that

her condition met listings 12.03 due to a bipolar disorder and 12.04 due to anxiety, simply stating

that Wysocki's impairments were "not severe enough to meet or medically equal one of the

impairments listed in Appendix 1, Subpart P, Regulations No. 4." R. 369. He purported to rely

upon the opinion of a psychologist who reviewed Wysocki's records for the SSA in July 2001, to

-3-

conclude that Wysocki's mental impairments resulted in only "mild-to-moderate mental functional

limitations," even though the record to which he referred reflects marked limitations in

concentration, persistence and pace.  *Compare* R. 371 (citing exhibit CR 38), with R. 457 (exhibit

CR 38).  The ALJ also observed that Wysocki's condition was "responsive and amenable to

conservative treatments and medications," if only Wysocki had been compliant with her doctors'

instructions.  R. 371.  He concluded that, despite her impairments, Wysocki could return to her

past relevant work as an armed security guard.  R. 372.  Wysocki again appealed this decision to

this Court.

The Commissioner, now for the third time, asks that the Court reverse the decision and

remand the case so he can do that which the SSA has been instructed to do since 1998 – obtain a

medical expert who can aid in determining the severity and onset date of Wysocki's disability.

Such an expert is required by Social Security Rule 83-20 in cases like this in which an ALJ must

assess when a disability began.

Wysocki reasonably argues that the Commissioner has had sufficient opportunity to

comply with the orders of this Court, the directions of the Appeals Council, and its own rules and

regulations.  Accordingly, she seeks an order remanding the case with the direction that the

Commissioner award benefits to her.

## II.     SUMMARY OF THE FACTS.

The evidence in the record has been reviewed in the three ALJ's decisions and need not be

repeated in detail here.  In summary, Wysocki was born on March 12, 1963.  R. 43.  She attended

school through the twelfth grade and subsequently obtained a GED.  R. 44.  She had worked as an

armed security guard, worked in manufacturing, and had done clerical work.  R. 44-45, 96-97.  She

stopped working in 1989 due to uncontrollable diarrhea caused by a spastic colon, and severe

migraine headaches.  R. 46, 49.

Frank C. Sacco, Ph.D., a clinical psychologist and Wysocki's former brother-in-law,

averred that Wysocki began having mood swings and was reclusive and depressed when she

became pregnant in 1989.  R. 506-15.  Wysocki's former husband testified that Wysocki also

began having panic attacks in 1989, and that Wysocki was having suicidal thoughts and walked

around in a delusional state starting in 1990.  R. 558-61.

Medical records show that Wysocki was repeatedly hospitalized in 1993 and 1994 as a

result of suicide attempts.  *See, e.g.,* R. 153-55, 189.  Lisa M. Grossman, B.A., and Wayne Stein,

Psy.D., examined Wysocki and administered psychological tests to her in July 1993.   The

examination and testing revealed that Wysocki's "current level of functioning is impaired.  She is

under chronic emotional distress and is unable to utilize her resources effectively.  Testing

indicates that there is evidence of a disorder in [Wysocki's] thought processes, for her thinking

tends to be somewhat disturbed and confused."  R. 161.  Her insight and judgment were poor,

especially in highly emotional situations.  *Id.*  She saw "the world as a predominantly threatening

place."  R. 162.  The diagnostic impression included the following: dysthymia, primary, early

onset; major depression, single episode, with psychotic features (provisional); post-traumatic stress

disorder; personality disorder not otherwise specific with borderline, histrionic and passive-

aggressive features.  Her then current global assessment of functioning (GAF) score was 40, with a

high of 45 in the previous year.  R. 162.[1]  Ms. Grossman and Dr. Stein concluded that "[d]ue to the frequency of [Wysocki's] suicidal thoughts, her sense of hopelessness, and her recent somewhat superficial attempts at suicide, [Wysocki] is potentially harmful to herself and currently needs to be monitored regularly."  R. 163.

Marianne Jones, R.N., LCSW, CAP,[2] treated Wysocki in individual therapy sessions from July 1993 through at least April 2000.  R. 212-15, 441.  Jones wrote in January 1996, that Wysocki's "depression and anxiety and mood swings, at times, are so severe she needs to be seen more often so that she can cope with her feelings and remain grounded . . . .  She has a difficult time maintaining her daily activities . . . .  I do not see that she is able to work at this time."  R. 212-13.

Wysocki was hospitalized against in January 1994 after another suicide attempt.  R. 181-83.  The intake report by Jose-Rafael Gonzalez, M.D., reflects that Wysocki was undergoing individual psychotherapy with Marianne Jones, and had been prescribed Zoloft.  She did not keep an appointment with her physician after she was discharged from the hospital in 1993.  R. 182, 186-87.  She was transferred to Medfield Hospital for continued hospitalization.  R. 183.

---

[1]  The Global Assessment of Functioning (GAF) scale is used to report an individual's overall level of functioning. A GAF rating between 31 and 40 reflects: "Some impairment in reality testing or communication (eg, speech is at times illogical, obscure, or irrelevant) OR major impairments in several areas, such as work or school, family relations, judgment, thinking, or mood (eg, depressed man avoid friends, neglects family, and is unable to work . . . .).  HAROLD I. KAPLAN, M.D. & BENJAMIN J. SADOCK, M.D., SYNOPSIS OF PSYCHIATRY 299 (8th ed. 1998) (hereinafter SYNOPSIS OF PSYCHIATRY).  A GAF rating between 41 and 50 reflects: "Serious symptoms (eg, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupation, or school functioning (eg, no friends, unable to keep a job).  Id.

[2]  Registered Nurse, Licensed Clinical Social Worker and Certified Addiction Professional.

The intake report of Medfield Hospital reflects a GAF score at admission of 25 to 30[3], indicating that Wysocki had an inability to function in almost all areas.  R. 189.  She admitted to hearing voices.  R. 190.  She was discharged a month later, in March 1994, to the Women's Partial Hospitalization Program with a GAF score of 60-65.[4]  The diagnosis was major depression, recurrent and personality stress disorder.  R. 191-92.

Ronald L. Seifer, Ph.D., examined Wysocki on October 19, 1994, at the request of the SSA.  Dr. Seifer noted that Wysocki had a "bizarre appearance," and she reported hearing multiple voices.  She had been taking Zoloft, but she could no longer afford it.  R. 198-99.  She described a history of abuse and mood swings, which Dr. Seifer averred were indicative of a possible manic disorder.  R. 199.  Dr. Seifer's assessment was that Wysocki suffered from the following:  post traumatic stress disorder; dissociative disorder not otherwise specified; cyclothymia;[5] and a personality disorder not otherwise specified with hysteriod features.  Dr. Seifer assessed that he needed to rule out bipolar disorder with further examination.  R. 200.

---

[3] A GAF rating between 21 and 30 reflects: "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (eg, sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (eg, stays in bed all day; no job, home, or friends).  SYNOPSIS OF PSYCHIATRY at 299.

[4] A GAF rating between 51 and 60 reflects: "Moderate symptoms (eg, flat effect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (eg, few friends, conflicts with peers or coworkers)."  SYNOPSIS OF PSYCHIATRY at 299.

[5] A "chronic mood disorder that results in short period of mild emotional and behavioral 'highs' alternating with short periods of mild to moderate depression."  It is a less severe form of bipolar disorder.  *Cyclothymia*, MayoClinic.com,  http://www.mayoclinic.com/health/ cyclothymia/DS00729 (last visited Sept. 10, 2007).

On November 3, 1994, A. Amir Mirsajadi, M.D., performed a psychiatric examination of Wysocki at Circles of Care, Inc. Wysocki reported that she had depression and anxiety with related symptoms.  She had been taking Zoloft, which was effective initially but was no longer effective. She was referred to Circles of Care, Inc. after she lost her insurance.  R. 204.  Dr. Mirsajadi's initial diagnosis was dysthymia with migraine headaches.  R. 205.  Wysocki reported in December 1994 and February 1995, that she had been taking her medication regularly and felt better, but she still had occasional anxiety and crying spells.  Dr. Mirsajadi's diagnosis remained the same.  R. 202-03.

Dr. Sacco averred that "in the last [ten] years [since 1995], [Wysocki] has displayed extreme agoraphobic symptoms.  She rarely leaves home and if she does she may panic at any moment.  She is very hypersensitive and may suffer delusions causing her to have false beliefs about the intentions of others."  507 ¶ 4.  He opined that Wysocki was "totally unemployable" because she  could not "tolerate any stress [or] contact with [other] people[,] . . . ha[d] poor attention and concentration and [was] easily overwhelmed with anxiety."  *Id.* ¶ 6.

Records from Circles of Care, Inc. of treatment of Wysocki between March 1996 and October 1998 reflect that Wysocki's mental condition continued to fluctuate.  R. 326-39.  In March 1996, B. Calligaris-Paez, M.D., opined that Wysocki had bipolar I disorder.  R. 339. Although Wysocki told Dr. Calligaris-Paez in April 1996 that she felt better, the doctor noted that Wysocki was  "hyper."  R. 338.  In July 1996, Wysocki told Dr. Calligaris-Paez that she did not feel good, despite taking medication.  Dr. Calligaris-Paez observed signs of anxiety, with only fair cognitive functioning.  R. 337.  During an examination in September 1996, Dr. Calligaris-Paez

-8-

observed that Wysocki "looks compensated for the moment[,]" R. 336, but in December 1996 he

observed that Wysocki had had some decompensation.  R. 335.  Dr. Calligaris-Paez wrote in July

15, 1998, that Wysocki was "taking so much medication, but it's the only way that she can control

herself."  Nevertheless, he noted that she still had anxiety.  R. 328.

Nancy MacKay, Ph.D., with Burnham Woods Counseling Centers of Florida, Inc.,

examined and tested Wysocki on January 14, 1999.  Wysocki drove herself to the appointment.  R.

340.  Wysocki complained of depression, daily panic attacks, and manic episodes, among other

things.  She told Dr. MacKay that she was covering her windows "with tin foil so that she can't see

out and others can't see in," and she said, "'I know I've been abducted by aliens.'" R. 341.  She

reported auditory hallucinations.  She asked to be called "Billie Taylor," instead of Ms. Wysocki.

*Id*.  She was taking a number of medications.  *Id.*  Dr. MacKay opined that Wysocki's attention

and concentration were mildly impaired, but her insight and judgment were markedly impaired.

*Id*.  Dr. MacKay concluded that Wysocki would have marked difficulty consistently relating

appropriate to coworkers and supervisors.  R. 343.  The results of the MMPI-2 were invalid either

because Wysocki was malingering or exaggerating or due to a "'cry for help.'"  R. 342.  Dr.

MacKay's diagnosis was that Wysocki suffered from the following: bipolar I disorder; post

traumatic stress disorder; and panic disorder without agoraphobia.  She assessed Wysocki's GAF

score then and for the preceding year at 40.  *Id.*

Medical records reflect that Wysocki was taking prescribed medications.  R. 351-54.  Yet,

in August 1999, Robert V. Radin, M.D., added a diagnosis of attention-deficit/hyperactivity

disorder.  R. 353.  In September 1999, T.S. Baskaran, M.D., added an additional diagnosis of

borderline personality disorder.  R. 349.  Dr. Baskaran observed that Wysocki "has had some ups

and downs" despite taking her medication.  R. 348.  In November 1999, she told Dr. Baskaran that

"[s]he feels that the CIA often watches her.  She also has a feeling that her activities are being

monitored by, even, aliens from outer space."  *Id*.  Dr. Baskaran noted that Wysocki's judgment

was impaired, and that she was in a hypomanic state.  *Id*.

     Therapist Marianne Jones wrote in June 2001, that "Wysocki has periods of major

depression when she completely isolates herself inside her house.  She can change in a short period

of time becoming hypomanic and grand[iose] – dressing bizarre and at times hearing voices."  R.

442.

     In July 2001, K. Eeltink, Ph.D., completed functional capacity assessments based on a

review of Wysocki's records.  Dr. Eeltink opined that Wysocki had marked limitations in the

ability to maintain concentration, persistence or pace, and moderate limitations in activities of

daily living and social functioning.  R. 443-44, 457.

## III.    JURISDICTION.

     "[W]hen a case is remanded by a Federal court for further consideration, the decision of the

[ALJ] . . . become[s] the final decision of the Commissioner after remand . . . unless the Appeals

Council assumes jurisdiction of the case."  20 C.F.R. § 404.984(a).  "The Appeals Council may

assume jurisdiction based on written exceptions to the decision of the [ALJ] . . . file[d] with the

Appeals Council" within thirty days, or by itself within sixty days of the date of the ALJ's

decision.  *Id.*  "If no exceptions are filed and the Appeals Council does not assume jurisdiction

[within sixty days] . . . the decision of the [ALJ] becomes the final decision of the Commissioner

after remand." *Id.* at (d).  In other words, "[w]hen . . . an action has been remanded previously for further consideration, a claimant dissatisfied with the ensuing decision may elect not to file exceptions.  If the Appeals Council does not review the case *sua sponte*, the decision [of the ALJ] becomes the Commissioner's final decision after sixty days." *Chamberlin v. Barnhart*, 382 F. Supp. 2d 867, 869 (E.D. Tex. 2005).

In this case, the ALJ's decision became the final decision of the Commissioner because the Appeals Council has not assumed jurisdiction over the matter. Therefore, the Court has jurisdiction pursuant to 42 U.S.C. § 405(g), and as adopted by reference in 42 U.S.C. § 1383(c)(3).

**IV.    STANDARD OF REVIEW.**

To be entitled to disability benefits under OASDI or SSI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). In a case seeking disability benefits under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits.  42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits.  In sum, an ALJ must apply the following criteria, in sequence:

> (1) Is the claimant presently unemployed?
>
> (2) Is the claimant's impairment severe?
>
> (3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?
>
> (4) Is the claimant unable to perform his or her former occupation?
>
> (5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability.  A negative answer leads to a finding of "not disabled."  *See, e.g.*, *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1987).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits."  *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)).  However, "the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform."  *Id*. at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206,

-12-

1210 (11th Cir. 2005), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210. "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision. *Dyer*, 395 F.3d at 1210. The court may not reweigh the evidence or substitute its own judgment. *Id*.

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988). Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law. *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1146 (11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

## V.     ANALYSIS.

An award of benefits is appropriate only when the Commissioner has considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt.  *See Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993).   However, when the record as a whole "bespeaks disability," the Court has the discretion to order an award of benefits.  *See, e.g., Esselstrom v. Chater*, 67 F.3d 869, 874 (9th Cir. 1995).  This is such a case.

In the ALJ's decision dated November 28, 2005, which is the subject of this request for review, the ALJ reviewed the evidence of record, but he did not obtain the medical expert required by previous Court orders and by the Appeals Council.  In reaching his decision, the ALJ did not explain why he did not accept the opinions of the treating, consulting and reviewing physicians and other treating professionals regarding the functional limitations arising from Wysocki's mental impairments.   He also did not offer specific and adequate reasons for rejecting the testimony of Wysocki, her former husband, and Dr. Sacco, her former brother-in-law, regarding the early manifestation of her mental impairment in 1989.

The uncontested record reflects that Wysocki exhibited symptoms of a mental impairment in 1989, when she was pregnant.  She became reclusive and depressed, had panic attacks, and by 1990 had suicidal thoughts.  Those thoughts became actions in 1993 and 1994, when she repeatedly attempted suicide.  She was formally diagnosed in 1993 with a depressive syndrome,

with a GAF score of 40, which reflects major impairments including an inability to work.  The

treating professionals opined that Wysocki had a GAF score of only 45 the previous year, which

reflects severe impairments.[6]

Wysocki's condition deteriorated after her second suicide attempt to a GAF score of 25 to

30, reflecting inability to function in almost all areas.  Although her condition improved after

inpatient treatment, she decompensated after being released.  By October 1994, she was hearing

voices and continued to have mood swings that were ultimately diagnosed as bipolar disorder.

While extreme use of medication helped Wysocki stabilize, she was never without functional

limitations.  Therapist Jones and Dr. Calligaris-Paez observed that Wysocki still had episodes of

decompensation.  By 1999, Wysocki's insight and judgment were markedly impaired, and Dr.

MacKay opined that Wysocki would have marked difficulty consistently relating appropriately to

coworkers and supervisors. Even the reviewing psychologist concluded that Wysocki would have

marked limitations in concentration, persistence and pace.

The ALJ's finding that Wysocki's condition stabilized when she was compliant with

prescribed treatment and medication is not supported by substantial evidence in the record.  While

there is evidence that Wysocki sometimes did not take medication due to financial constraints, and

sometimes abused her medication, the record reflects that even when she was compliant with

medication and treatment she continued to have severe functional impairments.  Indeed, the law

recognizes that individuals with severe mental impairments may, from time to time, compensate to

---

[6] While the Commissioner has not endorsed the GAF scale as indicative of functional capacity for purposes of disability determinations, *see Wind v. Barnhart*, 133 Fed. Appx. 684, 692 n.5 (11th Cir. 2005), an ALJ is required to determine what, if any, weight to place on the score, *see McCloud v. Barnhart*, 166 Fed. Appx. 410, 418 (11th Cir. 2006).

the point that they might be able to work, but this does not constitute the ability to hold sustain employment necessary to undercut a finding of disability. *See, e.g., Singletary v.* Bowen, 798 F.2d 818 (5th Cir. 1986); *Wallace v. Barnhart*, 256 F. Supp. 2d 1360, 1371- 73 (S.D. Fla. 2003); *Williams v. Apfel*, 73 F. Supp. 2d 1325, 1341 (M.D. Fla. 1999).

When an ALJ ignores or fails properly to refute a treating physician's opinion,  the opinion is accepted as true as a matter of law. *See MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986).  Similarly, when an ALJ does not credit a claimant's testimony about functional limitations arising from her impairments, the testimony must also be accepted as true. *See Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995).   Because the ALJ here did not discuss the weight he gave to the evidence in the record regarding the degree of Wysocki's functional impairments, did not properly refute the opinions of her treating and examining physicians, and did not articulate specific and adequate reasons to discount Wysocki's credibility, and the testimony of her family members, all of the evidence of Wysocki's functional impairments is accepted as true as a matter of law.  As such, as outlined in detail in the memorandum of law filed by Wysocki's attorney, the record is clear that Wysocki met Listing 12.04 for an affective disorder and Listing 12.06 for an anxiety disorder during the closed period.

The Commissioner argues that he should be given yet another opportunity to retain a medical expert to determine precisely when during the closed period Wysocki became disabled. There is no reason to believe that the SSA would do so if the case were again remanded, having failed to comply with the previous directions of this Court and the Appeals Council.  Rather, the record is as fully developed as the SSA cares to make it.  As the SSA has had ample opportunity to

assess the essential evidence, and the cumulative effect of the evidence establishes disability without any doubt, it is appropriate to remand this case with the direction that the Commissioner award benefits to Wysocki for September 1, 1989, through January 31, 2001.

**VI.     CONCLUSION.**

For the reasons set forth herein, it is **ORDERED** that the decision of the Commissioner is **REVERSED** and the case is **REMANDED** under sentence four of 42 U.S.C. § 405(g) for an award of benefits during the period of September 1, 1989, through January 31, 2001.  The Clerk of Court is directed to issue a judgment consistent with this Order and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on September 11, 2007.

*Karla R. Spaulding*

KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

-17-